IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

|  |  |
|---|---|
| D.B., ET AL., | CIVIL ACTION No. 6:09-CV-00013 |
| *Plaintiffs,* | |
| v. | MEMORANDUM OPINION |
| BEDFORD COUNTY SCHOOL BOARD, | |
| *Defendant.* | JUDGE NORMAN K. MOON |

Plaintiffs[1] filed this suit pursuant to the Individuals with Disabilities Education Act

("IDEA" or "the Act"), 20 U.S.C. § 1400, *et seq.*, asking the court to review an administrative

due process hearing and reverse the Hearing Officer's finding that Defendant had provided D.B.

a free and appropriate public education as required by the Act. Presently before the court are the

parties' cross-motions for summary judgment (docket nos. 37 & 49) and responses thereto,

Defendant's motion to strike Plaintiffs' additional evidence (docket no. 53), and Plaintiffs'

motion for leave to file supplemental exhibits (docket no. 57). The motions have been fully

briefed and oral arguments have been presented.[2] Upon review of the record, and as set forth

---

[1] Plaintiffs are "D.B.," a minor, bringing suit by and through his mother, "A.B.," who also brings suit in her own behalf. The full names of "D.B." and "A.B." are disclosed in the style of the complaint and elsewhere; however, the parties often refer to Plaintiffs by their initials. Pursuant to an order entered on April 7, 2010, the Clerk of the Court reformed the style of this case on the public docket to reflect these abbreviations rather than disclose the Plaintiffs' names. I will refer to the individual Plaintiffs as "D.B." and "A.B.," and will attempt to redact with those initials all references herein to their names.

[2] This matter was set for a bench trial April 21 & 22, 2010. On April 7, 2010, I entered an order directing the Clerk of the Court to remove the trial from the court's schedule, given that my disposition of the cross-motions for summary judgment would leave no issue to advance to trial, and that the instant memorandum opinion and order addressing the parties' cross-motions for summary judgment and other pending motions would be forthcoming in due course.

herein, it is apparent that Defendant failed to evaluate D.B. for specific learning disability and failed to provide D.B. a free and appropriate public education as required by the Act, and the Hearing Officer erred in determining otherwise. Accordingly, I will grant Plaintiffs' motion for summary judgment, and will deny Defendant's motion for summary judgment. Additionally, Defendant's motion to strike Plaintiffs' additional evidence will be granted; Plaintiffs' motion for leave to file supplemental exhibits will be denied; and Plaintiffs will be directed to submit, within fourteen (14) days of the date of entry of the order accompanying this memorandum opinion, a petition for order of judgment (supplemented with a proposed judgment order), along with any other motions, such as a motion for attorney's fees pursuant to 20 U.S.C. § 1415(i)(3)(B).[3]

## I.

### A.

This action involves allegations that Defendant violated the Individuals with Disabilities Education Act. Plaintiffs allege the following: that Defendant (the Bedford County School Board) failed to correctly evaluate D.B., a student, for specific learning disabilities; that Defendant failed to design an Individual Educational Plan ("IEP") reasonably calculated to result in an educational benefit to D.B.; that Defendant failed to provide for a placement suited to D.B.'s educational needs; and that Defendant therefore failed to provide D.B. with a free and appropriate public education ("FAPE") as required by the IDEA. A.B. (D.B.'s mother), dissatisfied with D.B.'s progress, requested that Defendant place D.B. at New Vistas School ("NVS"), a private school in Lynchburg, Virginia. Having repeatedly notified Defendant of her

---

[3] The complaint included a request for an award of "court costs, witness fees, expenditures and reasonable attorney's fees, pursuant to 20 USC § 1415."

desire to enroll D.B. at NVS at Defendant's expense, and after exhausting her direct opportunities to present her reasoning for such enrollment to Defendant (but before the state educational agency conducted the due process hearing mandated by the IDEA), A.B. enrolled D.B. at NVS.

Defendant contends that it correctly evaluated D.B. for all suspected disabilities, reasonably calculated an IEP to confer an educational benefit, and developed an IEP to suit D.B.'s individual educational needs. In Defendant's view, a FAPE was provided to D.B.; the Hearing Officer's final decision, dated November 23, 2008, was correct; and this court, after giving deference to that decision and due weight to the administrative proceedings, should ratify the Hearing Officer's decision. Defendant further contends that, even if I should find that the IEP Defendant developed for D.B. was not reasonably calculated to result in an educational benefit, Plaintiffs' request for reimbursement should be denied because Plaintiffs failed to give proper notice to Defendant before enrolling D.B. in a private school.

### B.

Congress enacted the IDEA, in part, to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The IDEA establishes that children with disabilities are those who fall in the categories of mentally retarded, hearing impaired, speech or language impaired, visually impaired, seriously emotionally disturbed, orthopedically impaired, autistic, having traumatic brain injury, other health impaired, or having specific learning disabilities, who, by reason of their condition, need special education and related services. 20 U.S.C. § 1401(3)(A)(i). As a condition of federal financial assistance under

the Act, states must provide disabled children with a free appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A).

FAPE, as defined in the Act, must include special education and related services that: (a) have been provided at public expense, under public supervision and direction, and without charge; (b) meet the standards of the state educational agency; (c) include an appropriate preschool, elementary school, or secondary school education in the state involved; and (d) are provided in conformity with the individualized education program. 20 U.S.C. § 1401(9); 34 C.F.R. § 300.17. The Act does not explicitly define what is meant by an "appropriate" education, and neither the face of the Act itself nor the legislative history indicates a congressional intent that such education meet a specific substantive standard. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 188-90 (1982); *see also Kirkpatrick v. Lenoir Co. Bd. of Educ.*, 216 F.3d 380, 383 (4th Cir. 2000) ("The IDEA provides very little by the way of substantive standards to determine whether a child is receiving a free appropriate public education.").

In *Rowley*, the Supreme Court declined to establish a single test for determining the adequacy of educational benefits conferred upon children under the Act. 458 U.S. at 202. Rather, the Court held that a state satisfies the FAPE requirement "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Id.* at 203. Progress (or the lack thereof) is not dispositive with respect to whether a child receives FAPE. *M.S. ex rel. Simchick v. Fairfax Co. Sch. Bd.*, 553 F.3d 315, 327 (4th Cir. 2009); *In re Conklin v. Anne Arundel Co. Bd. of Educ.*, 946 F.2d 306, 313 (4th Cir. 1991). The IDEA does not require the school district to provide a disabled child with the best possible education, *M.M. ex rel. D.M. v. Sch. Dist.*, 303 F.3d 523, 526 (4th Cir. 2002) (citing *Rowley*, 458 U.S. at 192), or maximize each handicapped child's potential. *Hartmann v. Loudoun Co. Bd. of*

*Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997) (quoting *Rowley*, 458 U.S. at 199).

The Act requires, however, that FAPE be "tailored to the unique needs of the handicapped child by means of an 'individualized educational program' (IEP)." *Rowley*, 458 U.S. at 181-82. The IEP is prepared at a meeting between a qualified representative of the local educational agency ("LEA"), the child's teacher, the child's parents or guardian and, where appropriate, the child. 20 U.S.C. § 1414(d)(1)(B); *Honig v. Doe*, 484 U.S. 305, 311 (1988); 34 C.F.R. § 300.321(a). The IDEA mandates that, when evaluating a child "to gather relevant . . . information . . . that may assist in determining . . . whether the child is a child with a disability . . . and . . . the content of the child's individualized education program," the LEA "shall . . . use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." 20 U.S.C. § 1414(b)(2). The IDEA imposes "[a]dditional requirements," including the requirement that "[e]ach local educational agency shall ensure that . . . *the child is assessed in all areas of suspected disability*." 20 U.S.C. § 1414(b)(3)(B) (emphasis added). An IEP must contain "statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *M.M. ex rel. D.M.*, 303 F.3d at 527 (citing 20 U.S.C. § 1414(d)(1)(A)); *see also* 34 C.F.R. § 300.320(a). An IEP must be reviewed once per year to ensure the child is receiving FAPE. *Honig*, 484 U.S. at 311; 34 C.F.R. § 300.324(b)(1). In some situations, "evidence of actual progress may be relevant to a determination of whether a challenged IEP was reasonably calculated to confer some educational benefit." *M.S. ex rel. Simchick*, 553 F.3d at 326-27 (emphasis in original).

The IDEA establishes certain procedural safeguards to ensure the provision of FAPE by a

state educational agency ("SEA") or LEA. 20 U.S.C. § 1415; *see also* 8 Va. Admin. Code § 20-81-170 (effective July 7, 2009 (amended January 25, 2010), superseding 8 Va. Admin. Code § 20-80-70). One such safeguard is the opportunity for an impartial due process hearing. 20 U.S.C. § 1415(f)(1)(A); *see also* 8 Va. Admin. Code § 20-81-210 (effective July 7, 2009 (amended January 25, 2010), superseding 8 Va. Admin. Code § 20-80-76). At the conclusion of a due process hearing, an aggrieved party may file a civil action in federal court challenging the decision rendered. 20 U.S.C. § 1415(i)(2)(A). In such a case, the court's inquiry is twofold: (1) has the state complied with the procedures set forth in the Act, and (2) is the IEP reasonably calculated to enable the child to receive educational benefits? *Rowley*, 458 U.S. at 206-07.

## C.

A summary judgment motion is "the most pragmatic procedural mechanism for resolving IDEA cases." *Hanson ex rel. Hanson v. Smith*, 212 F. Supp. 2d 474, 481 (D. Md. 2002); *see also DeLullo v. Jefferson Co. Bd. of Educ.*, 71 F. Supp. 2d 554, 559-60 (N.D. W. Va. 1998), *aff'd*, 194 F.3d 1304 (4th Cir. 1999) (*per curiam*) (allowing a district court reviewing a state administrative decision under the IDEA to grant summary judgment based upon the administrative record). Generally, summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In the IDEA context, however, a motion for summary judgment challenging an administrative ruling "may more aptly be described … as a motion for summary adjudication." *Cone v. Randolph Co. Sch. Bd. of Educ.*, No. 1:06cv579, 2009 WL 3064723, at *4 (M.D. N.C. Sept. 22, 2009) (quoting *Hanson ex rel. Hanson*, 212 F. Supp. 2d at 480); *see also J.P. ex rel. E.P. v. Ripon Unified Sch.*

*Dist.*, No. 2:07cv02084, 2009 WL 1034993, at *2 (E.D. Cal. Apr. 15, 2009) ("Though not a true motion for summary judgment, the appeal of an IDEA-based due process hearing decision is properly styled and presented by the parties in a summary judgment format."); *Fitzgerald v. Fairfax Co. Sch. Bd.*, 556 F. Supp. 2d 543, 550 (E.D. Va. 2008) ("It is well-settled and undisputed by the parties that a district court reviewing a state administrative decision under the IDEA may grant a motion for judgment on the administrative record.").

In IDEA cases, the existence of a disputed issue of material fact will not defeat a motion for summary judgment. *J.S. ex rel. Y.S. v. North Colonie Cent. Sch. Dist.*, 586 F. Supp. 2d 74, 81 (N.D. N.Y. 2008) (quoting *J.R. v. Bd. of Educ.*, 345 F. Supp. 2d 386, 394 (S.D. N.Y. 2004)); *see also Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) ("[A] motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact. Rather, the motion serves as a 'pragmatic procedural mechanism' for reviewing a state's compliance with the procedures set forth in IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits."). Indeed, federal courts are charged by statute with conducting an independent judicial review of the administrative decision and considering the administrative record as well as additional evidence at the request of a party; courts must base their decisions on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C). However, the requirement that the court base its decision on the preponderance of the evidence "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982); *accord DeLullo*, 71 F. Supp. 2d at 559. "The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the

child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child." *Rowley*, 458 U.S. at 207. The judicial review proceedings under the IDEA have been described as "something short of a trial *de novo*." *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 790 (1st Cir. 1984); *see also Damian J. v. Sch. Dist.*, No. 06-3866, 2008 WL 191176, at *2 (E.D. Pa. Jan. 22, 2008) ("The 'due weight' requirement has been described as 'modified *de novo*' review, and is the appropriate standard of review of administrative hearing decisions in IDEA cases."). The ultimate question is whether a proposed IEP is adequate and appropriate for a particular child at a given point in time. *Town of Burlington*, 736 F.2d at 788.

In conducting their review, courts must give due weight to the state administrative proceeding. *Rowley*, 458 U.S. at 206. In determining the due weight to be given to an administrative decision, courts should "examine the way in which the state administrative authorities have arrived at their administrative decision and the methods employed." *Doyle v. Arlington Co. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). The due process hearing officer's findings of fact are entitled to be considered prima facie correct. *Id.* at 105; *DeLullo*, 71 F. Supp. 2d at 559. Otherwise, the due process proceedings would be reduced "to a mere dress rehearsal by allowing appellants to transform the Act's judicial review mechanism into an unrestricted trial *de novo*." *Springer v. Fairfax Co. Sch. Bd.*, 134 F.3d 659, 667 (4th Cir. 1998). If a district court declines to follow the hearing officer's factual findings, it is required to explain why it does not. *Doyle*, 953 F.2d at 105; *DeLullo*, 71 F. Supp. 2d at 559.

It is well-established that the party challenging the decision of a due process hearing officer bears the burden of proof. *Barnett ex rel. Barnett v. Fairfax Co. Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991); *Tice ex rel. Tice v. Botetourt Co. Sch. Bd.*, 908 F.2d 1200, 1206 n.5 (4th Cir.

1990); *Town of Burlington*, 736 F.2d at 794; *Fitzgerald*, 556 F. Supp. 2d at 550. Thus, in this case, the burden of proof lies with Plaintiffs.

## II.

A state hearing officer ("HO") conducted a three-day due process hearing in this matter on October 23, 24, and 25, 2008.[4, 5]  On November 23, 2008, the HO issued a 35-page report finding that A.B. had not sustained her burden of proof, that Defendant had made a FAPE available to D.B., and that Defendant was not required to pay for the cost of D.B.'s attendance at NVS. Because the HO found that D.B. had been provided with a FAPE, the HO made no determination regarding A.B.'s alleged failure to provide sufficient notice of her intent to enroll D.B. in a private school.

### A.

The HO made the following findings of fact.

D.B. was born on March 13, 1999, and was 9 years old at the time of the hearing. Campbell County Schools referred D.B. for a psychological evaluation and, on May 21, 2004, D.B. was assessed. On June 22, 2004, while he was enrolled in Campbell County Public Schools, D.B was determined to be developmentally delayed, and thus eligible for special education and related services. On August 30, 2004, D.B. transferred from Campbell County Public Schools ("CCPS") to Bedford County Public Schools ("BCPS"), where he was a student

---

[4] The hearing was conducted under the auspices of the Virginia Department of Education, Division of Special Education and Student Services, Office of Dispute Resolution and Administrative Service. The HO's final decision states that the HO "was appointed hearing officer in this matter from a list supplied by the Supreme Court of the Commonwealth of Virginia."

[5] Giving due weight to the due process hearing officer's findings, *see Doyle v. Arlington Co. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991), I have adduced the facts in this opinion from the evidence presented in the Stipulated Administrative Record ("S.A.R."). The S.A.R. consists of 2,465 pages.

at Thomas Jefferson Elementary School ("TJES") until his mother placed him at NVS in August 2008.

In the fall of 2004, when D.B. first enrolled in TJES as a kindergarten student, BCPS proposed to accept the IEP for D.B. from CCPS for 30 days, with the BCPS IEP team to be convened by September 26, 2004; A.B. gave her consent to this arrangement on August 26, 2004. On September 24, 2004, BCPS convened an IEP meeting, summarized by the HO as follows (quoted verbatim except for bracketed insertions):

> [D.B.] had the identified disability of Developmentally Delayed. Accommodations and modifications include: close proximity to the teacher-verbal and visual cues to call attention to task-directions repeated and clarified-quiet area for calming down, as needed. Services includes resource DD-60 minutes per day, inclusion, 258 minutes per day, and speech and language-60 minutes per week. Parent signed indicating she received a copy of her rights and giving permission to implement the IEP on 9/24/04.

The HO further found that "[t]he IEP of 9/24/04 noted [D.B.] is functioning in the Deficient range in cognitive development. Consideration was given to self contained placement but it was felt that he could make more progress having peer role models and the support of special education staff in the classroom." D.B. attended kindergarten at TJES in the 2004-05 school year, and repeated kindergarten in the 2005-06 school year. Since then, he has been promoted every year to the next grade.

D.B. was placed in the special education program at TJES. IEP meetings were conducted on the following dates: December 8, 2004; February 1, 2005; May 9, 2005; August 25, 2005; and May 8, 2006. A.B. "signed the IEPs indicating . . . that she gave permission to implement the IEP and the placement decision. She attended all but the 2/1/05 IEP meetings [*sic*]."[6] At the

---

[6] Because of work obligations and short notice of the meeting, A.B. missed the meeting on February 1, 2005.

IEP meeting on December 8, 2004, "it was noted [D.B.] was having difficulty with fine motor skills. He was seen at an [occupational therapy] screening in October of 2004 and a full occupational therapy evaluation was recommended." That evaluation was conducted on January 12, 2005, and was discussed at the IEP meeting on February 1, 2005, which A.B. was unable to attend, and which the HO summarized as follows (quoted verbatim except for bracketed insertions): "[D.B.] exhibited impaired fine motor and visual motor skills. A self contained placement was considered but it was felt he could make more progress having peer role models and having support in the classroom and his needs could be met in [the] resource [room][7] and in the inclusion/general education classroom."[8]

The HO summarized the next three IEP meetings as follows:

Parent attended the IEP meeting of 5/9/05 which provided for speech and language of 30 min. 3 times a week, occupational therapy for 30 min. once a week, and DD classroom services 288 minutes a day. He had inclusion with a Kindergarten class for music, PE, Library, and art.

Parent attended the IEP meeting of 8/25/05 which essentially continued services for speech and language of 30 min. 3 times a week, occupational therapy for 30 min. once a week, and DD classroom services 288 minutes a day. He had

---

[7] D.B. received some services, such as speech therapy, in a setting called "the resource room," away from the inclusion classroom setting.

[8] The HO's finding that, at the end of the 2004-2005 school year, "a self contained placement was considered but it was felt he could make more progress having peer role models and having support in the classroom and his needs could be met in resource and in the inclusion/general education classroom," stands in contrast to the IEP's written statement in the IEP of May 9, 2005, which stated:

> Inclusion setting was discussed but [D.B.] made very little progress in that setting this year. He had the benefit of a special education teacher and aide in the classroom at all times. He had a one hour pull-out each day to work in small group and individually. Despite this high level of services, he has not made adequate progress. . . . He is much more comfortable in a small group and tends to participate more freely in that setting.

Nonetheless, pursuant to the IEP of August 25, 2005, D.B. repeated kindergarten in an inclusion setting because the IEP team had "reconsidered [D.B.'s] placement in the self contained classroom and now believe it is in his best interest be [sic] included in the inclusion classroom." The IEP of August 25, 2005 indicates "no other options considered."

inclusion with a Kindergarten class for music, PE, Library, and art.

The 5/8/06 IEP was attended by Parent and provided for speech and language of 30 minutes twice a week, occupational therapy for 30 min. once a month, resource 60 minutes a day, support for language arts 30 minutes a day, and inclusion 120 minutes a day.

(Quoted verbatim, internal citations omitted.)

The IEP of May 3, 2007, to which A.B. consented,

provided for 30 minutes a week of speech and language services, 2.5 hours daily of support for content areas, and 30 minutes resource services plus accommodations and modification including adult proximity, present information visually and or hands on when possible, provide copy of board work at his desk, reduce length of assignments, reduce number of problems, small group reinforcement for new skills broken down into small steps, use a number line in math, use alphabet strip that has pictures and letters, use drill and repetition, use highly structured programmed reading material that gives multiple exposures to each new work, and math aids.

(Quoted verbatim, internal citations omitted.)

The IEP of December 14, 2007, to which A.B. consented,

increases resource support services from 30 minutes per day provided for in the 5/8/07IEP to 90 minutes. This was small group instruction outside the general education classroom. Added to previous accommodations and modifications were oral responses to test - group size - environmental modification - test in small group, in short periods, cut down on visual field, repeat verbal prompts, individual administration.

(Quoted verbatim, internal citations omitted.)

The HO stated that, "[o]n December 13, 2006, Parent, [*sic*] received a 'Reevaluation Notification/Consent' indicating [D.B.] needed a re-evaluation." A.B. consented to the reevaluation, which "was required as [D.B.] was aging out of 'Developmental Delay[.]'" The record indicates that Defendant provided evaluations of D.B. on February 28, 2007, March 2, 2007, and March 6, 2007; these evaluations were used to complete a psychological evaluation that was reported in written form on March 12, 2007. The evaluation included a series of tests

and observations, and concluded that D.B. scored in the low to very low range for children his age. Pursuant to the March 23, 2007, decision of an "eligibility committee," Defendant classified D.B. as Other Health Impaired ("O.H.I."), as a result of Attention Deficit Hyperactivity Disorder ("ADHD"), and other factors noted in his psychological evaluation, including very low scores on evaluative testing. A separate disability classification of mental retardation ("M.R.") was considered, but D.B. was not classified as such. The HO expressed these facts in the following findings (quoted verbatim, except for bracketed insertions and elisions; internal citations omitted):

> The March 12, 2007 Psychological Evaluation indicated that [D.B.] functioned in the low to very low range for children of his age. His general cognitive and processing abilities, as measured by the KABC-II [Kaufman Assessment Battery for Children, Second Edition] and CAS [not defined], respectively, were deficient. He exhibited some varied abilities that reflect areas of relative strength. He responds well to repeated exposure to information, and his long-term retrieval abilities are well-developed. Teacher and parent ratings on the BRIEF [not defined] indicate he continued to be impacted by his inattention in both home and school settings. Ability to utilize working memory was a particular area of weakness. Information provided on the ABAS-II [not defined] indicates adaptive skills are delayed for his age. Conceptual skills are extremely low across settings.

> * * *

> On March 23, 2007 the eligibility committee found [D.B.] to be eligible for special education and related services with the identified educational disability of [O.H.I.]. Recommended related services were "Speech and Language".

> * * *

> [D.B.] had a medical diagnosis of Inattentive type ADHD. . . . The eligibility committee took this into consideration.

The HO observed that the eligibility committee rejected the M.R. classification, citing D.B.'s "'[s]catter in cognitive abilities, scatter in adaptive behavior, global delays in achievement, language, and adaptive skills; [m]ental retardation not seen beeause [*sic*] ability

scores were scattered. . . .[']" A.B. "consented to and signed on 3/27/07 the eligibility meeting minutes determining [D.B.] to be eligible for special education services with the educational disability of [O.H.I.] and which noted, after consideration, the committee did not find mental retardation."

An IEP meeting was held on April 29, 2008, and A.B. duly consented to its implementation. The IEP of April 29, 2008 provided "about three hours of specialized instruction per day," "SOL [state Standards of Learning] Testing Accommodations were provided," as were other "accommodations/modification as needed." The other "accommodations/modification as needed" included "allowing extra time to respond," allowing D.B. "to give oral responses," "dictation to a scribe" in lieu of writing, a "peer tutor/helper," "preferential seating," and "reduce[d] length of assignments." The list of other "accommodations/modification as needed" is unclear and garbled, but suggests that test questions were to be read aloud to D.B.

The HO found that, on June 17, 2008, A.B., "by letter, requested an IEP meeting to determine a new placement for [D.B.] at the New Vistas School. She further indicated that she has [*sic*] invited Charlotte Morgan, Head of School and Lisa Thomas, assistant Head of School of New Vistas to attend the meeting." Pursuant to A.B.'s request, on July 10, 2008, "an IEP (addendum) meeting was convened" to review the IEP of April 29, 2008.[9] Summarizing the meeting of July 10, 2008, the HO stated that it was

called at the request of Parent. *The meeting discussed Parent's desire that [D.B.]*

---

[9] The record indicates that D.B.'s first IEP at TJES was drafted on September 24, 2004, and subsequent IEPs are dated as follows: May 9, 2005; August 25, 2005; May 8, 2006; May 3, 2007; December 14, 2007; and April 29, 2008. The April 29, 2008, IEP includes an addendum dated July 10, 2008. A.B., D.B.'s mother, consented to all the IEPs except for the addendum of July 10, 2008.

*be placed at New Vistas School.*  The IEP for the 2008-2009 school year developed in the spring of 2008 was discussed.  Proposals made at the meeting include a summer program, a time study, a consultation with the literacy development specialist, curriculum modification, and an early comprehensive evaluation.  *The placement at New Vistas School was denied.*

(Emphasis added.)

At the IEP meeting on July 10, 2008, A.B.'s sole request was for D.B.'s placement to be changed to a private school day placement at NVS.  The request was rejected.  The HO stated that "Least Restrictive Environment (LRE) was a consideration in the IEP team not concurring with Parent's request for a placement at" NVS.

The HO observed that, on May 19, 2008, A.B. applied for D.B. to be admitted to NVS, which the HO described as "a private school located in Lynchburg, Virginia . . . exclusively for disabled children.  It is licensed by the Commonwealth of Virginia as a special education private day school."  (Internal citations omitted.)  The HO found that D.B. "attends [NVS] since the beginning of the 2008-2009 school year," where he was "transitioned into a lower level of instruction than the level of instruction at [NVS] he initially started."  At NVS, D.B. "receives services with a teacher and at times with high school intern(s).  The high school intern(s) are not formally trained but are provided with information as to what to do and are monitored."  The HO observed that BCPS placed D.B. "in an inclusion classroom," and that "[t]he only psychological testing data that [NVS] has relied on is the psychological testing data provided by" BCPS.

The HO made the following additional factual findings (verbatim quotes, except for bracketed insertions):

- D.B. "was diagnosed with ADHD, inattentive type."

- Phonological Awareness Literacy Screening ("PALS") "is a screening instrument [D.B.] has taken and which enables progress to be gauged.  It is taken by all students in BCPS unless excluded by their respective IEP."

- PALS "is a screening that's used as a way to guide reading intervention. [PALS] benchmarks are established at each grade level and at each administration point in the year. The benchmarks are the expectations for the non-disabled student in the general curriculum."

- "Performance across two [PALS] administrations for [D.B.] in the Fall of 2007 and in the Spring of 2008 indicated" the following: D.B.'s "total spelling score went from 0 to 7"; his "preprimer word list went from 5 to 11"; his "COW (Concept of Words) went from 5 to 11"; his "alphabet recognition went from 25 to 26"; his "letter sounds went from 12 to 21"; his "blending went from 1 to 20"; and his "sound to letter went from 1 to 20."

- "The Commonwealth of Virginia has general education standards of learning and the aligned standards of learning. The aligned standards of learning focus on a functional living curriculum. The S.O.L. curriculum focus on general education content."

- "Students have access to general curriculum content unless it has been determined they are candidates for the aligned standards of learning or the alternative assessment program."

- "Removing [D.B.] from the S.O.L. tract [*sic*] would place him in a less rigorous program that would not be aligned with the grade level curriculum but aligned with skills for functional daily living expressions of skills."

- "Removing a student from grade-level content, the SOL curriculum tract [*sic*], into alternative tracts [*sic*] is a decision with significant ramifications that could impact a student's ability to attend college."

- "The first time a student accesses the S.O.L. assessments is in the 3rd grade. The 12/04/07 IEP team expressed the desire to maintain [D.B.] eligible for the third year S.O.L. and for him to have an opportunity to pass it. Grade three is cumulative content and assesses matters in science, social studies, math, and reading skills that would have been present in those curriculums in previous years."

- "The 4/29/08 IEP increases accommodations/modifications from the 12/14/07 IEP."

- "Ms. Charlotte Morgan [Head of NVS] attended the IEP meeting of 7/10/08 and provided information concerning design of the [NVS] program. She did not present any alternative placement besides [NVS]

and did not suggest any program modifications or accommodations."

- "At the 7/10/08 IEP meeting Mrs. Robertson [Defendant's "Administrative Assistant for Special Services," who apparently is also a school psychologist] proposed a consultation with the literacy development specialist, consideration of curriculum modifications, and completing the triennial comprehensive evaluation earlier than currently scheduled to identify service needs. Also, the family asked about an after school reading assistant. This was discussed and it was agreed that [D.B.] needed to be a child and for him to receive the intensity of services in the I.E.P. then to continue after school might be a bit much for him to manage. The parents supported this position."

- "At the 7/10/08 IEP meeting neither Parent nor anyone else indicated that [D.B.] was going to be enrolled at [NVS], that he had applied to [NVS], or that he had been accepted at [NVS."

### *B.*

On August 17, 2008, lodging an appeal to the IEP committee's denial of her request for D.B. to be placed at NVS, A.B. signed a request for due process hearing, which stated, in part, "I would like for my son to be sent to an alternative school of learning which is New Vista[s]. . . ." On August 20, 2008, Defendant received the request for due process hearing from A.B. On August 21, 2008, A.B. enrolled D.B. at NVS for the 2008-09 school year. The HO observed the following regarding Plaintiffs' request for D.B.'s placement at NVS: "At Parent's request an IEP meeting was held on 7/10/08 in which *she presented her desire* to BCPS for the IEP team *to change her son's placement to New Vistas School*. However, *the IEP team refused her request for a change of placement for [D.B.] to New Vistas*." (Emphasis added.)

The HO observed that "[t]he fact that [D.B.] has a disability is not in dispute," and that the issues before the HO concerned "the identification and evaluation of [D.B] and whether he was properly and correctly identified as a child with a disability as required by the IDEA and by Virginia Law [*sic*]." Significantly, the HO observed that

> Parent has **contended that BCPS failed to properly and correctly identify and evaluate [D.B.] as a <u>child with a disability</u> as required by the IDEA and Virginia law**. Concern was raised as to [D.B.] **possibly having a Specific Learning Disability ("S.L.D.") and/or his being Mentally Retarded ("M.R.")**. However, testimony of Ms. Elizabeth Robertson, school psychologist, indicated that [D.B.] **did not meet the definition of Mentally Retarded**.[ ] She was <u>**a**</u> school psychologist with over fifteen years [*sic*] experience, had reviewed [D.B.'s] record, and the educational program offered him.[10]

(Emphases added.) Although the HO never addressed the question whether D.B. had been evaluated for a specific learning disability, the HO found that "[t]he Psychological Evaluation indicates [D.B.] does have a disability. He functions in the low to very low range for children of his age and his general cognitive and processing abilities are deficient. He does have some varied abilities that reflect areas of relative strength." The HO provided the following observations regarding the psychological evaluation and the categories of "mental retardation" ("M.R."), "other health impaired" ("O.H.I."), and "specific learning disability" ("S.L.D."):

> The eligibility committee concluded there was not evidence of Mental Retardation. Ms. Robertson indicated there was not sufficient evidence of adaptive behavior deficits to justify the classification of mental retardation. She testified this was a correct conclusion based upon procedural expectations as well as the A.A.M.R. [American Association on Mental Retardation] definition of mental retardation. It is further noted that Ms. Robertson is the only witness presented who was a psychologist. New Vistas School relied upon this same psychological evaluation.
>
> The BCPS eligibility meeting minutes indicated that mental retardation was considered but was not found and stated that "mental retardation not seen because ability scores were scattered (knowledge 81, learning, long-term memory 86).
>
> [D.B.] was classified as O.H.I. The O.H.I. classification was based on the diagnosis of ADHD in conjunction with the information in the psychological

---

[10] As discussed in my analysis, it is clear that the HO never addressed the question whether D.B. had been evaluated for a specific learning disability, although the question was clearly raised. It is also clear from the record that Defendant did not evaluate D.B. for a specific learning disability. I add also that Ms. Robertson did not perform D.B.'s psychological evaluation. *See also* n. 15, *infra*.

report.  BCPS requires a psychological profile consistent with the executive functioning deficits and a medical documentation of that disability.

Designating O.H.I. or M.R. or S.L.D. for a child was addressed in testimony.  *Services received would not necessarily have changed had [D.B.] been designated **M.R./S.L.D. (as opposed to O.H.I.)*** as an IEP is based on the individual student's needs.  Furthermore, there is no separate program for O.H.I. as opposed to M.R.  What designates the program of services for a child are the child's strengths, weaknesses, and educational performance.  Services are designated based on the student needs at each grade level.

[D.B.] has had a progression of IEPs over time.  The level of services have been reviewed and generally the level of individualized services have increased and the level of supplemental services increased.  His services were established based on his needs not his designation.

There is insufficient evidence presented to find that [D.B.] was improperly evaluated, identified, or classified.

(Emphases added; internal citations omitted.)

The HO drew the following conclusions:

• "Parent bears the burden of proof in this cause and has not sustained her burden of proof."

• "Bedford County Public Schools did not fail to identify and evaluate [D.B.] as a child with a disability and did not fail to properly and correctly identify and evaluate him with a disability as required by IDEA and Virginia Law."

• "Bedford County Public Schools did not fail to provide an appropriate educational placement by refusing to provide him sufficient special education services."

• "Bedford County Public Schools did not fail to consider alternative placement options in determining LRE in the IEP of 4/29/08, 5/3/07, and 12/14/07."

• "Bedford County Public Schools did not fail to consider parent's concerns, including adequate progress, when drafting the IEP of 4/29/08, 5/3/07, and 12/14/07."

• "Bedford County Public Schools has made a free appropriate public education available to [D.B.]."

The HO further concluded that, because BCPS had made a FAPE available to D.B., BCPS "is not required to pay for the cost of the private school placement at New Vistas School made by the Parent," and "[i]n light of this finding, no further determination is necessary on the issues relating to the requirements of Parent informing the IEP team and/or the 10 day written notice of intent to enroll in a private school at public expense." The HO determined that "[t]he requirements of notice to the Parent . . . were satisfied," that [t]he Child . . . has a disability" and "needs special education and related services," and that "[t]he LEA . . . is providing a FAPE." The HO found "in favor of the Bedford County Public Schools on all issues involved in this proceeding," denied "the request for the relief sought by the Parent," and that "[t]he prevailing party in this case as to every issue presented is the local educational agency, Bedford County Public Schools."

### C.

Upon my review of the record, Plaintiffs have carried their burden in showing that D.B.'s IEP was not reasonably calculated to enable D.B. to receive educational benefits. *Rowley*, 458 U.S. at 206-07. Although the record indicates that D.B received psychological testing, there is no indication that Defendant used this testing to evaluate him for specific learning disability, or to make any eligibility determinations regarding specific learning disability, and the HO erred in determining that BCPS had properly evaluated him as a child with a disability.

As I have already remarked, the IDEA mandates that, when evaluating a child "to gather relevant . . . information . . . that may assist in determining . . . whether the child is a child with a disability . . . and . . . the content of the child's individualized education program," the LEA "shall . . . use technically sound instruments that may assess the relative contribution of

cognitive and behavioral factors, in addition to physical or developmental factors." 20 U.S.C. §

1414(b)(2). The IDEA imposes "[a]dditional requirements," including the requirement that

"[e]ach local educational agency *shall* ensure that . . . the child is assessed in *all areas of*

*suspected disability*." 20 U.S.C. § 1414(b)(3)(B) (emphasis added). The IDEA defines "child

with a disability" to mean a child

> (i) with *mental retardation*, hearing impairments (including deafness), speech or
> language impairments, visual impairments (including blindness), serious
> emotional disturbance (hereinafter referred to as "emotional disturbance"),
> orthopedic impairments, autism, traumatic brain injury, *other health impairments*,
> or *specific learning disabilities*; and
>
> (ii) who, by reason thereof, need[ ] special education and related services.

20 U.S.C. § 1401(3)(A) (emphasis added). I stress that the disabilities listed in § 1430(3)(A) are

distinct and separate, and that mental retardation, other health impairments, and specific learning

disabilities are included in this list of distinct and separate disabilities. Significantly, "specific

learning disability" ("S.L.D.") is defined as follows:

> (A) In general
>
> The term "specific learning disability" means a disorder in 1 or more of the basic
> psychological processes involved in understanding or in using language, spoken
> or written, which disorder may manifest itself in the imperfect ability to listen,
> think, speak, read, write, spell, or do mathematical calculations.
>
> (B) Disorders included
>
> Such term includes such conditions as perceptual disabilities, brain injury,
> minimal brain dysfunction, dyslexia, and developmental aphasia.
>
> (C) *Disorders not included*
>
> Such term does not include a learning problem that is primarily the result of
> visual, hearing, or motor disabilities, of *mental retardation*, of emotional
> disturbance, or of environmental, cultural, or economic disadvantage.

20 U.S.C. § 1401(30) (emphasis added). This definition explicitly indicates that "specific

learning disability" and "mental retardation" are contraindicated.

Pursuant to 20 U.S.C. § 1221e-3, the Secretary of the Department of Education has issued regulations regarding the identification of specific learning disabilities as provided by the IDEA.[11]  Part 34 of the Code of Federal Regulations, § 300.307(a), provides that "[a] State *must* adopt," consistent with 34 C.F.R. § 300.309, "criteria for determining whether a child has a specific learning disability, as defined in 34 C.F.R. § 300.8(c)(10)."[12]  (Emphasis added.)  *See also* U.S.C. §§ 1401(30), & 1414(b)(6).  Section 300.8(c) includes the following distinct and separate definitions:

> (6) *Mental Retardation* means significantly subaverage general intellectual functioning, existing concurrently with deficits in adaptive behavior and manifested during the developmental period, that adversely affects a child's educational performance.

> * * *

> (9) *Other health impairment* means having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that –

> (i) is due to chronic or acute health problems such as asthma, attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and

> (ii) Adversely affects a child's educational performance.

> (10) *Specific learning disability* – (i) *General*.  Specific learning disability

---

[11] These regulations were in effect when the transactions and occurrences of the instant case took place.  The reauthorized Individuals with Disabilities Education Act was signed into law on December 3, 2004, by President George W. Bush.  The provisions of the act became effective on July 1, 2005, with the exception of some of the elements pertaining to the definition of a "highly qualified teacher" that took effect upon the signing of the Act.  The final regulations were published on August 14, 2006.

[12] The state criteria are set forth in the Virginia Administrative Code, Special Education Regulations, and generally track the federal regulations.  *See generally* 8 Va. Admin. Code § 20-81 (effective July 7, 2009, superseding 8 Va. Admin. Code § 20-80).

means a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.

(ii) *Disorders not included.* Specific learning disability does not include learning problems that are primarily the result of visual, hearing, or motor disabilities, of <u>mental retardation,</u> of emotional disturbance, or of environmental, cultural, or economic disadvantage.

(Underscored emphasis added.) Again, I observe that "specific learning disability" and "mental retardation" are explicitly contraindicated.[13]

---

[13] The state regulations similarly contraindicate these disorders. "Specific learning disability" is defined in 8 Va. Admin. Code § 20-81-10 as follows:

"*Specific learning disability*" means a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.

Specific learning disability does not include learning problems that are primarily the result of visual, hearing, or motor disabilities; of *intellectual disabilities*; of emotional disabilities; of environmental, cultural, or economic disadvantage. (§ 22.1-213 of the Code of Virginia; 34 CFR 300.8(c)(10))

Dyslexia is distinguished from other learning disabilities due to its weakness occurring at the phonological level. Dyslexia is a specific learning disability that is neurobiological in origin. It is characterized by difficulties with accurate and/or fluent word recognition and by poor spelling and decoding abilities. These difficulties typically result from a deficit in the phonological component of language that is often unexpected in relation to other cognitive abilities and the provision of effective classroom instruction. Secondary consequences may include problems in reading comprehension and reduced reading experience that can impede growth of vocabulary and background knowledge.

(Emphasis added.) "Intellectual disability" is defined in 8 Va. Admin. Code § 20-81-10 as follows:

"*Intellectual disability*" means the definition formerly known as "mental retardation" and means significantly subaverage general intellectual functioning, existing concurrently with deficits in adaptive behavior and manifested during the developmental period that adversely affects a child's educational performance. (34 CFR 300.8(c)(6))

The predecessor regulations, repealed as of July 7, 2009, defined these disorders similarly. *See* 8 Va. Admin.
(continued...)

A parent may request an initial evaluation or a reevaluation of a child with a disability. 34 C.F.R. §§ 300.301, 300.303.  The evaluative criteria adopted by the state must not require the use of a severe discrepancy between intellectual ability and achievement for determining whether a child has a specific learning disability, as defined in 34 C.F.R. § 300.8(c)(10); must permit the use of a process based on the child's response to scientific, research-based intervention; and may permit the use of other alternative research-based procedures for determining whether a child has a specific learning disability, as defined in 34 C.F.R. § 300.8(c)(10).  34 C.F.R. § 300.307(a).  A public agency must use the state criteria adopted pursuant to 34 C.F.R. § 300.307(a) in determining whether a child has a specific learning disability.  34 C.F.R. § 300.307(b).

As set forth in 34 C.F.R. § 300.308, the determination of whether a child suspected of having a specific learning disability is a child with a disability must be made by a group that includes the child's parents and a team of qualified professionals, who may determine that a child has a specific learning disability by considering factors set forth in 34 C.F.R. § 300.309. For a child suspected of having a specific learning disability, the documentation of the determination of eligibility (as required by 34 C.F.R. § 300.306(a)(2)), *must* contain a statement that includes *whether the child has a specific learning disability*, and *the basis for making that determination*.  34 C.F.R. § 300.311(a)(1) and 2.  If the child has participated in a process that assesses the child's response to scientific, research-based intervention, the documentation of eligibility must contain a statement that includes the following:  the instructional strategies used

---

[13](...continued)
Code § 20-80-10 (defining "mental retardation" and "specific learning disability"; "'Specific learning disability' . . . does not include learning problems that are primarily the result of . . . mental retardation. . . ."

and the student-centered data collected; and documentation that the child's parents were notified about (1) the state's policies regarding the amount and nature of student performance data that would be collected and the general education services that would be provided, (2) strategies for increasing the child's rate of learning, and (3) the parents' right to request an evaluation.  34 C.F.R. 300.311(a)(7).[14]

---

[14] The state criteria follow the federal regulations.  For example, 8 Va. Admin. Code § 20-81-80(D), "Procedures for determining eligibility and educational need" (citing 34 C.F.R. §§ 300.306 through 300.311) (formerly 8 Va. Admin. Code 20-80-56(C), "Procedures for determining eligibility"), requires that

> (5) The local educational agency shall provide the parent with a copy of the documentation of the determination of eligibility at no cost. This documentation shall include a statement of:
>
> a. Whether the child has a specific disability.
> b. The basis for making the determination including an assurance that the determination has been made in accordance with the provisions of this section regarding determining eligibility and educational need.
> c. The relevant behavior, if any, noted during the observation of the child and the relationship of that behavior to the child's academic functioning.
> d. The educationally relevant medical findings, if any.
> e. The instructional strategies used and the student-centered data collected if the child has participated in a response to scientific, research-based intervention process. This document shall also include:
>> (1) The local educational agency's notification to the parent of the Virginia Department of Education's policies regarding the amount and nature of student performance data that would be collected and the general education services that would be provided;
>> (2) The strategies that were used to increase the child's rate of learning; and
>> (3) The parent's right to request an evaluation.
> f. For identification of a child with a specific learning disability, whether consistent with the requirements of subdivisions T 2 a and T 2 b of this section, the child does not achieve adequately for the child's age or to meet Virginia-approved grade-level standards; and
>> (1) The child does not make sufficient progress to meet age or Virginia-approved grade-level standards; or
>> (2) The child exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, Virginia-approved grade-level standards or intellectual development.
> g. For identification of a child with a specific learning disability, the group's determination is
> consistent with the requirements of subdivision T 2 c of this section.

(continued...)

There is no indication in the record that the IEP team discussed or even considered that

D.B. should be or had been evaluated for any specific learning disability, such "as perceptual

---

[14](...continued)
Subdivision T of 8 Va. Admin. Code § 20-81-80 provides as follows:

T. Eligibility of a child with a specific learning disability. (34 CFR 300.307 and 34 CFR 300.309)
1. The group may determine that a child has a specific learning disability if:
a. The definition of "specific learning disability" is met in accordance with 8VAC20-81-10; and
b. The criteria for determining the existence of a specific learning disability are met.
2. The criteria for determining the existence of a specific learning disability are met if:
a. The child does not achieve adequately for the child's age or to meet Virginia-approved grade-level standards in one or more of the following areas when provided with learning experiences and instruction appropriate for the child's age or Virginia-approved grade-level standards:
(1) Oral expression;
(2) Listening comprehension;
(3) Written expression;
(4) Basic reading skills;
(5) Reading fluency skills;
(6) Reading comprehension;
(7) Mathematical calculations; or
(8) Mathematical problem solving.
b. The child does not make sufficient progress to meet age or Virginia-approved grade-level standards in one or more of the areas identified in subdivision 2 a of this subsection when using a process based on the child's response to scientific, research-based intervention; or the child exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, Virginia-approved grade-level standards, or intellectual development, that is determined by the group to be relevant to the identification of a specific learning disability, using appropriate assessments, consistent with 8VAC20-81-70.
c. The group determines that its findings under subdivisions 2 a and b of this subsection are not primarily the result of:
(1) A visual, hearing, or motor impairment;
(2) Intellectual disability;
(3) Emotional disability;
(4) Environmental, cultural, or economic disadvantage; or
(5) Limited English proficiency.
3. The Virginia Department of Education does not require the use of a severe discrepancy between intellectual ability and achievement for determining whether a child has a specific learning disability. (34 CFR 300.307(a))

disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia," although the record strongly suggests that he has a "disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities." 20 U.S.C. § 1401(30)(B); 34 C.F.R. § 300.8(c)(10). My review of D.B.'s eligibility documentation did not disclose any statements 1) whether D.B. has a specific learning disability, as required by 34 C.F.R. § 300.306(a)(2), nor 2) any basis for making that determination, as required by 34 C.F.R. § 300.311(a)(1). *See* Stipulated Administrative Record ("S.A.R.") 1428-1527. And, although the eligibility documentation in the record suggests that D.B.'s basic psychological processes were tested, there is nothing in the eligibility documentation or elsewhere in the record indicating that he was evaluated for disabilities such as "perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia." 34 C.F.R. § 300.8(c)(10)(i) (defining specific learning disability). Indeed, Defendant's written argument presented to the HO states "Beth Robertson[15] is the only witness with any qualifications to discuss these matters and her testimony was that SLD was properly ruled out. Additionally, dyslexia is not a recognized classification in this context." S.A.R. 2287 (internal citation omitted). This statement regarding dyslexia is clearly erroneous, given that the federal regulation defining "specific learning disability" includes "dyslexia." 34 C.F.R. § 300.8(c)(10)(i). And it is not at

---

[15] Defendant presented "Elizabeth Robertson," a "school psychologist," as its witness regarding D.B.'s psychological testing, and "Beth Robertson" was designated as a "party representative" for Defendant. *See also* n. 10, *supra*. The eligibility documentation indicates that the psychological evaluation of D.B., dated March 12, 2007, was performed by "Elsie Howerton, M.A., M.T., School Psychologist." S.A.R. 1475-1482. Ms. Howerton did not appear before the HO.

all discernible on what basis Ms. Robertson determined that S.L.D. had been "properly ruled out."

The record discloses further clear error regarding Defendant's and the HO's understanding of "specific learning disability." Defendant's written argument to the HO, the text of which the HO's opinion largely followed and adopted, explicitly shows that Defendant failed to recognize that M.R., S.L.D., and O.H.I. are separate and distinct categories of disability, and that M.R. and S.L.D. are contraindicated. S.A.R. 2270-2327. In its written argument, Defendant argued that "[t]he evidence is clear that the potential classification of SLD was examined and ruled out during the evaluations. The basis of a SLD designation would have been mental retardation as a result of [D.B.'s] low cognitive scores." S.A.R. 2286-87. However, this is clearly erroneous, given that, pursuant to the pertinent regulations, S.L.D. and M.R. are contraindicated, *i.e.*, they are mutually exclusive, and thus M.R. would *not* have formed "[t]he basis of a SLD designation."

The HO's opinion and the testimony of Elizabeth Robertson indicates that the HO and Ms. Robertson both suffered from this confusion regarding the distinctions between mental retardation, other health impairment, and specific learning disability. The record discloses that the IEP team determined that D.B. was "other health impaired," in that he suffered from attention deficit disorder, and rejected only one other classification or diagnosis, mental retardation. This apparently sufficed for the HO and Ms. Robertson, but it does not fulfill the requirements of the IDEA. The applicable sections of the Act and the pertinent regulations, recapitulated above, indicate that mental retardation, other health impairment, and specific learning disability are three separate and distinct disabilities, yet the HO addressed A.B.'s concerns that D.B. had not been properly and correctly evaluated for S.L.D.s with the statement

-28-

that the "testimony of Ms. Elizabeth Robertson, school psychologist, indicated that [D.B.] did not meet the definition of Mentally Retarded." This statement (and the testimony described therein) fails to address the question, which was A.B.'s contention that D.B. had not been evaluated for a specific learning disability.

Dispensing with A.B.'s contention, the HO observed that D.B. is not mentally retarded, but instead "was classified as O.H.I. . . . based on the diagnosis of ADHD." The HO concluded that "*[s]ervices received would not necessarily have changed had [D.B.] been designated M.R./S.L.D. (as opposed to O.H.I.)* as an IEP is based on the individual student's needs" and that "there is no separate program for O.H.I. as opposed to M.R." (Emphases added.) Some statements within these conclusions may be true, but they reveal the following errors. First, the HO mistakenly coupled or linked M.R. and S.L.D., "as opposed to O.H.I.," and the IEP could not accurately be described as based on D.B.'s "individual" needs if he were evaluated on the basis of this mistaken comparison. Regarding the HO's observation that "services . . . would not *necessarily* have changed" had D.B. been diagnosed as "M.R./S.L.D. (as opposed to O.H.I.)," services provided to D.B. *nonetheless might well have changed* had he been evaluated (as required by law) for S.L.D. and subsequently been diagnosed with S.L.D. And, although there may be "no separate program for O.H.I. as opposed to M.R.," there is no acknowledgment that a separate program might, in fact, be warranted or even required for a diagnosis of S.L.D. (for which D.B. was never tested) as opposed to O.H.I and M.R. Furthermore, the pertinent regulations clearly indicate that diagnoses of M.R. and S.L.D. are mutually exclusive, and the absence of any mention of O.H.I. in the regulation defining S.L.D. indicates that a classification of O.H.I. is irrelevant to an evaluation for specific learning disabilities.

Accordingly, the HO erred in concluding that "[t]here is insufficient evidence presented

to find that [D.B.] was improperly evaluated, identified, or classified," because what the record *actually* reveals is that there was insufficient evidence to find that D.B. had been properly evaluated for specific learning disability, and the HO's regard for Defendant's evaluation of D.B. for M.R. and O.H.I., without considering the requirements concerning S.L.D., failed to apprehend the statutory and regulatory distinctions between these disabilities.[16]   *See, e.g., Department of Educ. v. L.K.*, 2006 WL 1892220 (D. Haw. 2006) (upholding a hearing officer decision that the defendant failed to address a child's underlying learning disabilities by treating the student as a child with emotional disturbance, thus denying the child appropriate education; also upholding tuition reimbursement award).   Although a psychologist tested D.B., Defendant did not properly evaluate D.B. for S.L.D. and make eligibility determinations regarding S.L.D., as required by the Act; therefore, D.B.'s IEP could not have been appropriately crafted, and

---

[16] I note the following evidence regarding S.L.D., which was presented to the HO.  Charlotte Morgan, Head of NVS, is a state certified reading specialist with almost 40 years of education experience.  Ms. Morgan stated that she recognized "red flags" for SLD in the psychological testing used to evaluate D.B. in 2007.  She stated the D.B. would benefit from her program at NVS, which is licensed to serve children with OHI, SLD, emotional disturbances, and traumatic brain injuries.  She concluded that, based on the psychological testing contained in D.B.'s 2007 evaluation, D.B.'s "communication skills continue to be impacted by weakness with receptive and expressive language . . . these weaknesses are impacting his performance in the classroom [and] would be a red flag to me to investigate specific language [*sic*] disability" and that these "red flags" would suggest to her that she should "go [in] search of a specific learning disability."  S.A.R. 622-23.  She stated that, as a reading specialist, she would assess D.B. for S.L.D. related to his lack of progress in reading and other academic areas because she "would want to rule out S.L.D. in this child looking at all the records . . . as a professional."  Ms. Morgan based her opinion that D.B. should have been evaluated for S.L.D. in 2007 on the "clear peaks in language processing" as well as "some clear peaks in cognition" revealed by her analysis of D.B.'s sub-scores on the his March 2007 Kaufman Assessment Battery for Children.  Ms. Morgan testified that her review of D.B.'s educational re-evaluation in March 2007 revealed that the IEP team made no effort to consider testing D.B. for S.L.D., despite obvious irregularities ("peaks and valleys") in D.B.'s standardized test scores.

On cross-examination, Margaret Smith, a reading specialist employed by Defendant concurred with Ms. Morgan's observations, admitting that, "in [her] professional opinion as a reading specialist, if a child has had difficulties to the degree [D.B.] has in reading, writing, speaking and listening for over a two-year – a year and a half period, and mental retardation has been ruled out," then the child should be evaluated for a specific learning disability.  S.A.R. 1149-50.  Defendant offered no testimony to rebut the testimony of its own reading specialist.

Defendant failed to provide him FAPE.

### D.

Defendant failed to properly consider specific learning disability; therefore the IEPs Defendant prepared for D.B. could not have been "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982). I add that the record contains additional support for Plaintiffs' argument that the IEPs were not reasonably calculated to enable D.B. to receive educational benefits.

Although the HO observed that D.B. was promoted a grade every year, the HO failed to comprehend that this token advancement documents, at best, a sad case of social promotion. While an "appropriate" education does not mean the "best" possible education, "Congress did not intend that a school system could discharge its duty under the [Act] by providing a program that produces some minimal academic advancement, no matter how trivial." *County School Board of Henrico County, Virginia v. Z.P. ex rel. R.P.*, 399 F.3d 298, 300 (4th Cir. 2005) (citations and quotations omitted). The record indicates that D.B. consistently showed a "lack of measurable progress," "insufficient progress," and regression (in terms of retained learning). While enrolled in BCPS, D.B. was making only trivial, minimal academic advancement toward the goals in his IEP; the goals, services, and placement proposed for D.B. in the IEP for 2008-2009 IEP were not reasonably calculated to confer an educational benefit beyond minimal academic advancement; and therefore Defendant denied D.B. a free and appropriate education.

The record is simply replete with evidence of D.B.'s failure to progress. Although the HO stated that, since repeating kindergarten, D.B. was "promoted in each successive school year to the next grade," it is incontrovertible from the documentation in the record that D.B. cannot in any meaningful way read (given that test questions must be read to him), write (given that he

requires the services of a scribe), or spell, at or near his grade level or otherwise, and that his purported advancement is "social promotion," not "passing the grade" in the sense of academic achievement.  According to D.B.'s educational record of over 500 pages, covering four years in an inclusion classroom at TJES, including IEP notations, anecdotal progress reports, and standardized test results, D.B. did not reach any of his reading-related general goals, benchmarks, or assessments, nor was he successful on any of his standardized tests.  D.B. never made more than "a showing of minimal improvement on some test results."  *Hall by Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir. 1985).  During the 2007-2008 school year, D.B. failed every benchmark test save one.  S.A.R. 925 ("Ten assessments . . . indicate[] 'fail'. . . . only one assessment indicates 'pass' or 'proficient[.]'" (examination of Elizabeth Robertson)).  On D.B.'s spring 2007 PALS ("Phonological Awareness Literacy Screening") test, D.B. recognized 3 words from the Primer Word List; on the spring 2008 test, he recognized *zero* words from that list.  This is a significant regression, considering that D.B. was expected, according to the annual goals set forth in his 2007-2008 IEP, to make progress on a second grade reading level.  Similarly, on the spring 2007 PALS test in the category described as "Oral Reading in Context: Level B – Letter Sounds," D.B. scored 18 out of 20, which represents 90% of the minimum level of competency in reading for the second grade.  On his spring 2008 test in the same category, he scored 21 out of 26, which is about 81% of the minimum level of competency in reading for the second grade, and represents, in percentage terms, a 9% regression from the year before.  Other categories represent no progress whatsoever, or de minimis progress.  D.B.'s spring 2007 PALS test in the "Oral Reading in Context" section indicates D.B. was reading on a Preprimer level with 96% accuracy; a year later, he had improved only a single percentage point on the Preprimer level.

The HO misconstrued D.B.'s progress on his PALS scores in the Level B Concept of Word ("COW") category. On the spring 2007 PALS test, D.B. scored 7 out of 24, or 29%, in the COW category; on his spring 2008 test, he scored 10 out of 25, which is 40%. Accordingly, D.B. showed an improvement of 11%. Inexplicably, the HO concluded that D.B. had made a 100% gain in his COW score. Likewise, the HO wrote that, over the course of the 2007-2008 year, D.B.'s sight words recognition "increased to 35" from a "significantly lower" point; however, the Annual Goals of the 2006-2007 state that D.B. "recognized" 34 sight words; a year later, the IEP of April 29, 2008, indicates that he had "only mastered around 35 sight words in reading and does not recall them consistently." This represents a single word increase in an entire academic year, which hardly represents even minimal progress.

Despite the PALS test results indicating that he never acquired "presentation" or "recognition" of any first- or second-grade level words during the 2007-2008 school year, BCPS and TJES nonetheless determined that D.B. was to be promoted to the third grade. S.A.R. 930 (cross-examination of Elizabeth Robertson). On June 6, 2008, the IEP team recorded that D.B. had made insufficient progress on the reading and written language annual goals set out in the 2007-2008 IEP. On his first Grade 2 Reading Benchmark test, he scored 32.14, and on his third Grade 2 Reading Benchmark test, he scored 25 – representing a drop of 7.14 points in that score in one school year. His PALS scores show that, after four years in BCPS, he is still unable to read beyond a preprimer level, *i.e.*, a below-basic, kindergarten level.

Despite this lack of progress, Defendant insisted that D.B.'s goals essentially be repeated from year to year, and that the inclusion classroom setting served him best. However, Ms. Howerton's psychological evaluation in March 2007 indicated that Defendant would need to "provide [D.B.] with a structured learning environment where expectations are explicit,

distractions are minimized, and reinforcement is frequent," and Zann Tweedy, a state-certified special education teacher with an endorsement in specific learning disability, gave the following testimony to the HO: "I couldn't imagine [D.B.] being in a classroom with more than six or seven people and being able to learn or function." S.A.R. 515. The IEP notes contain numerous observations such as the following: that D.B. "repeatedly" asked to be excused from the inclusion classroom, so he could retreat to the "resource room"; that in inclusion classrooms of 20-22 students at TJES he "struggled to make progress either one-on-one or in a group"; and that the "[i]nclusion setting was discussed but [D.B.] made very little progress in that setting. . . . He is much more comfortable in a small group and tends to participate more freely in that setting." The notes of the IEP teams, *i.e.*, the persons with first-hand observations of D.B., clearly indicate an awareness that D.B. derived no benefit from the inclusion setting. Nonetheless, the IEP of April 29, 2008, proposed to repeat for a fifth year the formula of previous years, and all of D.B.'s instruction modifications were to be delivered in the inclusion classroom "as needed"; the only service proposed to be delivered outside the inclusion classroom was "speech and language therapy," for 30 minutes twice a week.

The IEP of April 29, 2008, copied nearly verbatim most of D.B.'s goals and benchmarks from the previous IEP. Although he had made "insufficient progress" on the reading annual goal set out for 2007-2008, there was no revision to that goal. Although he had made "insufficient progress" toward the written annual goal set out for 2007-2008, it was repeated verbatim in the 2008-2009 IEP, apparently with the expectation that he would achieve mastery on a third grade level although he had made no progress toward his second grade writing goals and continued to read on a preprimer level. It is simply unrealistic to write an IEP for D.B. with the goal that he will master four areas of literacy using third grade texts when he has not yet mastered reading on

the preprimer level and uses a scribe to record his thoughts, and he cannot derive an educational benefit from a plan so far out of proportion to his capabilities and preparation. An IEP is a "customized model of the child's curriculum and academic goals. The IEP is designed to meet *the child's needs*." *Bd. of Educ. of County of Kanawha v. Michael M.*, 95 F. Supp. 2d 600, 602 (S.D. W.Va. 2000) (citation omitted; emphasis added). The goals listed in a student's IEP must be "realistic and attainable, yet more than trivial and de minimis." *Id.* at 609.

Furthermore, the marginal benefits of educating D.B. in an inclusion setting are outweighed by his educational needs. While students with disabilities should be educated with their non-disabled peers to the "maximum extent appropriate," the IDEA "explicitly states that mainstreaming [of which inclusion is a form] is not appropriate 'when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.'" *Hartmann by Hartmann v. Loudon County Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997) (citing 20 U.S.C. § 1412(5)(B), and *Rowley*, 458 U.S. at 181 n. 4); *see also DeVries v. Fairfax County Sch. Bd.*, 882 F.2d 876, 879 (4th Cir. 1989) (mainstreaming is not required where (1) the disabled child would not receive an educational benefit from mainstreaming into a regular class; (2) any marginal benefit from mainstreaming would be significantly outweighed by benefits which could feasibly be obtained only in a separate instructional setting; or, (3) the disabled child is a disruptive force in a regular classroom setting). D.B.'s special education teacher at TJES testified to the HO that D.B.'s behavior, including "sucking his thumb," "crying," and "going around the room uncontrollably," "isolate[d] him" from his peers and that D.B. sometimes had to be removed from class. S.A.R. 1050-52. The record discloses that education in the inclusion classroom was so problematic for D.B. that his IEP of December 14, 2007, notes that he would "frequently beg to go to [the]

resource room to work."[17]  "[T]he value of having disabled children interact with non-handicapped students. . . .  is ultimately a goal subordinate to the requirement that disabled children receive educational benefit." *Hartmann*, 118 F.3d at 1002.

The record documents that, for four years, Defendant to a large extent simply repeated D.B.'s IEP goals from year to year, and that the IEPs, and the inclusion classroom settings provided therein, were not successful.  Defendant contends that the inclusion setting places D.B. on the "Standards of Learning," or "S.O.L." track, which would channel him into mainstream high school and college, and that placement in a private day school for disabled children disadvantages him because he would miss out on S.O.L. material.  It is difficult for me to accept the argument that D.B., who in the record before me has not yet passed a PALS or S.O.L. benchmark, and has actually regressed in some areas, must stay in the inclusion setting so he can follow the S.O.L. curriculum and remain on track to enter a college preparatory curriculum.[18] Although the HO found, and Defendant contends, that continued enrollment in the inclusion setting at TJES is the "least restrictive environment," "the IDEA's least restrictive environment requirement works in tandem with the FAPE requirement. . . ." *County School Board of Henrico County, Va. v. R.T.*, 433 F. Supp. 2d 657, 689 (E.D. Va. 2006).  For "a child who failed to make educational progress in a social environment, and, moreover derived little benefit from that

---

[17] That IEP further observes that D.B. "is so far behind academically" and "gets lost in the large group regular classroom setting and needs more individualized attention."  On June 8, 2006, the IEP team noted that, "[o]ften when he is asked a direct question, he will not answer or will become very upset to the point of crying even if it is a question he can answer."

[18] In other words, Defendant argues on the one hand that the reason D.B. can only make minimal progress is that his cognitive functioning is deficient; yet, on the other hand, Defendant insists that D.B. remain in the general education S.O.L. because "[r]emoving a student from grade-level content, the SOL curriculum tract [*sic*], into alternative tracts [*sic*] is a decision with significant ramifications that could impact a student's ability to attend college."

social environment[,] a more restrictive environment [is] the appropriate environment until such time as he [may] benefit from greater social interaction." *Id*.

### *E.*

Defendant has filed a motion to strike Plaintiffs' additional evidence (docket no. 53), and Plaintiffs subsequently filed a motion for leave to file supplemental exhibits (docket no. 57). Because I reached my decision based on the contents of the administrative record and the applicable law and regulations, and did not review any additional or supplemental exhibits, I will grant Defendant's motion to strike, and Plaintiffs' motion for leave to file supplemental exhibits will be denied.

### *F.*

Defendant contends that, should I find that Defendant has failed to provide FAPE to D.B., I should deny Plaintiffs' request for reimbursement because A.B. failed to give Defendant proper notice of her intention to enroll D.B. at NVS.

Title 20 U.S.C. § 1412(a)(10)(C) provides, in pertinent part:

(C) Payment for education of children enrolled in private schools without consent of or referral by the public agency

> (i) In general
>
> Subject to subparagraph (A), this subchapter does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.
>
> (ii) Reimbursement for private school placement
>
> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without

the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

(iii) Limitation on reimbursement

The cost of reimbursement described in clause (ii) *may* be reduced or denied--

>(I) if--

>(aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

>(bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);

>(II) if, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in section 1415(b)(3) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

>(III) upon a judicial finding of unreasonableness with respect to actions taken by the parents.

(Italicized emphasis added.)

I have already established that Defendant failed to provide a FAPE to D.B., and Defendant has not successfully rebutted Plaintiffs' argument that NVS is an appropriate

educational placement for D.B.[19]  *See School Committee of Town of Burlington, Mass. v. Department of Educ. of Mass.*, 471 U.S. 359, 370 (1985) (in order to receive reimbursement, the private education services obtained by the parents must be appropriate to meet the child's needs). However, Defendant argues that reimbursement should not be granted because A.B. "[f]ailed to provide written notice of her intent to withdraw D.B. and enroll him at New Vistas at public expense. . . ."  Essentially, Defendant relies on the absence in the administrative record of a written notice from A.B. that she intended to enroll D.B. at NVS.

In the first instance, I remark that 20 U.S.C. § 1412(a)(10)(C)(iii) provides that "[t]he cost of reimbursement . . . *may* be reduced or denied" – not "shall," but "may" – pursuant to the notice and other conditions set out therein.  (Emphasis added.)  Therefore, a court has the discretion to grant, reduce, or deny reimbursement, regardless of the degree or quality of notice the parent provided.[20]  *See, e.g., Shipler v. Maxwell*, Civil No. JFM 08-2057, 2009 WL 4544738

---

[19] The HO found that New Vistas is "a private school located in Lynchburg, Virginia . . . exclusively for disabled children" and that "[i]t is licensed by the Commonwealth of Virginia as a special education private day school."

[20] The Supreme Court of the United States observed, in *Florence County School Dist. Four v. Carter By and Through Carter*, 510 U.S. 7, 12 (1993), that the

> IDEA's grant of equitable authority empowers a court "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." [Quoting *School Comm. of Burlington v. Department of Ed. of Mass.*, 471 U.S. 359, 369 (1985).]  Congress intended that IDEA's promise of a "free appropriate public education" for disabled children would normally be met by an IEP's provision for education in the regular public schools or in private schools chosen jointly by school officials and parents. In cases where cooperation fails, however, "parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement." [*School Comm. of Burlington* at 370.]  For parents willing and able to make the latter choice, "it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials." *Ibid*. Because such a result would be contrary to IDEA's guarantee of a "free
>
> (continued...)

at *2 (D. Md. November 30, 2009) ("the denial of reimbursement is discretionary under the statute – it "*may* be reduced or denied.") (citations omitted); *Shipler v. Maxwell*, Civil No. JFM 08-2057, 2009 WL 2230026 at *6 (D. Md. July 23, 2009) ("Use of the word 'may' instead of 'shall' indicates that denial or reduction is discretionary.  Similarly, the words 'reduced or denied' also indicate that Congress intended the analysis to be discretionary.") (citations omitted); *Ashland Sch. Dist. v. Parents of Student E.H.*, 583 F. Supp. 2d 1220, 1226-27 (D. Or. 2008) (("Use of the word 'may' rather than 'shall' denotes that this denial or reduction is discretionary"; the statute "does not categorically prohibit awarding reimbursement to Parents due to their failure to comply with the notice requirement"); *Nein v. Greater Clark County Sch. Corp.*, 95 F. Supp. 2d 961, 984 (S.D. Ind. 2000) (observing that reduction or denial of reimbursement is discretionary).

Moreover, the Act does not require a written notice if the parent, "at the most recent IEP meeting that the parent[] attended prior to removal of the child from the public school," informed "the IEP Team that [the parent was] rejecting the placement proposed by the public agency. . . ." 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa).  The following phrase appears in the IEP notes from the meeting of July 10, 2008 (the most recent IEP meeting A.B. attended prior to removing D.B. to NVS), where Defendant rejected A.B.'s request to transfer D.B. to NVS, and informed A.B. that D.B. would remain in TJES as proposed in the IEP of April 29, 2008: "Parents reject proposal."  Thus, it is unequivocally clear that, at the most recent IEP meeting, A.B. rejected the continued placement of D.B. at TJES.  A.B. repeatedly indicated that she

---

[20](...continued)
appropriate public education," we held that "Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case." *Ibid*.

wanted D.B. to be placed at NVS. Her letter of June 17, 2008, specifically asks that an IEP team meeting be convened to consider her request that D.B. be enrolled at NVS for the 2008-2009 school year. The record indicates that Charlotte Morgan, Head of NVS, attended the July 10, 2008, IEP meeting for the express purpose of describing and explaining the NVS program.[21] Thus, given how the issue was presented to Defendant, and that the IEP notes indicate Defendant's awareness and perception that A.B. rejected the proposal of July 10, 2008, it is clear that A.B. gave sufficient notice of her intent to enroll D.B. at NVS. To the extent Defendant contends that it had insufficient notice of A.B.'s intention to enroll D.B. at NVS because it was unaware that A.B. sought the NVS placement *at public expense*,[22] there can be no other reason for A.B. to repeatedly raise the issue with Defendant. A.B. does not need Defendant's permission to enroll D.B. at NVS at her own expense, and common sense indicates that she would not have repeatedly requested that Defendant place her son at NVS had she not been

---

[21] As I have previously observed, the HO stated that IEP meeting of July 10, 2008, was "called at the request of Parent. The meeting discussed Parent's desire that [D.B.] be placed at New Vistas School. . . . The placement at New Vistas School was denied." The HO also observed that, as of May 19, 2008 A.B. had applied for D.B. to be admitted to New Vistas. The documentation of the IEP meting of July 10, 2008, indicates that the sole purpose of the meeting was to consider the request to place D.B. at New Vistas. A.B.'s request for a due process hearing stated, in part, "I would like for my son to be sent to an alternative school of learning which is New Vista[s]," and the HO observed that, "[a]t Parent's request an IEP meeting was held on 7/10/08 in which she presented her desire to BCPS for the IEP team to change her son's placement to New Vistas School. However, the IEP team refused her request for a change of placement. . . ."

[22] At the hearing before this court, Defendant argued that, even if "the totality of the circumstances clearly indicates that she was going to enroll him at New Vistas, even though she never did actually come out and say that, she never once said that she was going to demand that Bedford pay for the placement and that certainly cannot be implied from the totality of the circumstances." This argument is sophistry. There is no other reason for A.B. to approach the IEP team and ask for Bedford County Public Schools to place D.B. at NVS if she were not asking Bedford County Public Schools to pay for the placement. And, although Defendant contends that "she never did actually come out and say that" she intended to enroll D.B. at NVS, the specific content of the discussion at the IEP meeting that day cannot be proved or disproved, as there is no transcript. Common sense tells any objective reviewer that A.B. would not have gone through the exasperating process recounted herein of asking Defendant to place D.B. at NVS if she were not seeking the placement at public expense, and the IEP meeting notes indicate that she rejected the continued placement at TJES.

seeking such placement at public expense. Accordingly, I find that Plaintiffs are entitled to reimbursement of their expenditures for D.B. to attend NVS.

### III.

For the stated reasons, Plaintiffs' motion for summary judgment (docket no. 49) will be granted, Defendant's motion for summary judgment (docket no. 37) will be denied, Defendant's motion to strike Plaintiffs' additional evidence (docket no. 53) will be granted, and Plaintiffs' motion for leave to file supplemental exhibits (docket no. 57) will be denied. Plaintiffs will be directed to submit, within fourteen (14) days of the date of entry of the order accompanying this memorandum opinion, a petition for order of judgment (supplemented with a proposed judgment order), and any other motions, such as a motion for attorney's fees pursuant to 20 U.S.C. § 1415(i)(3)(B).

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this   *23rd*   day of April, 2010.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE